IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Richard Bishop, | ) | C/A No.1:10-2714-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report
and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.).
Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of
the final decision of the Commissioner of Social Security ("Commissioner") denying his
claim for Disability Insurance Benefits ("DIB"). On November 23, 2011, the undersigned
issued a Report [Entry #31] recommending this matter be reversed and remanded based
on the Appeals Council's failure to articulate a reason for denying review of the ALJ's
decision in light of the newly submitted evidence. [Entry #31]. By order filed January 18,
2012 [Entry #39]. the Honorable Timothy M. Cain declined to adopt the Report in light of
the Fourth Circuit's ruling in *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), issued on
December 2, 2011, that the Appeals Council is not required to articulate its rational for
denying a request for review. *Id*. at 707. Judge Cain recommitted this matter to the
undersigned for further analysis in light of *Meyer*.

The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.    Relevant Background

A.    Procedural History

Plaintiff applied for DIB[1] on March 22, 2007,[2] alleging he became disabled on May 28, 2002.[3] Tr. at 177–79, 205. Plaintiff's application does not list his claimed impairments, but an undated Field Office Disability Report indicates Plaintiff is claiming back problems, high blood pressure, depression, and anxiety.[4] Tr. 209.  His application

_____

[1] Plaintiff also filed an application for supplemental security income ("SSI"), but neither the ALJ nor Plaintiff references that application, and the Commissioner notes that it "appears that [Plaintiff's] application for SSI was withdrawn." Def.'s Br. at 2 n.2. *See* Tr. at 173–76 (SSI application) Tr. at 13 (ALJ's decision, referencing only Plaintiff's DIB application), Pl.'s Br. at 3 (referencing DIB application only).

[2] The ALJ and the parties indicate Plaintiff protectively filed his application on March 22, 2007. *See* Tr. at 13, Pl.'s Br. at 3, Def.'s Br. at 2. The application of record is dated March 28, 2007. Tr. at 177–79, *but see* Tr. at 205 (Field Office Disability Report listing March 22, 2007 as Plaintiff's protective filing date).

[3] In his application, Plaintiff alleged he became disabled on May 28, 2002. Tr. at 177. In a Field Office Disability Report, Plaintiff's alleged onset date is listed as December 19, 2003, which is the alleged onset date identified by the ALJ, Plaintiff, and the Commissioner. Tr. at 13, 205, Pl.'s Br. 3, Def.'s Br. at 2.

[4] Although Plaintiff's shoulder problems are not mentioned in the Field Office Disability Report, Plaintiff submitted medical records and testified regarding his shoulder pain (Tr. at 733–754, 948–953, 102), the ALJ specifically addressed his shoulder pain (Tr. at 17–19, 20–22), and the Commissioner has not challenged whether Plaintiff's

was denied initially and on reconsideration. Tr. at 154–57 (initial), 163–64 (recon.). At Plaintiff's request, Administrative Law Judge ("ALJ") Ivar E. Avots conducted a hearing on April 17, 2009, at which Plaintiff and a vocational expert ("VE") testified. Tr. at 72–130. On October 23, 2009, the ALJ conducted another hearing at which VE Benson Hecker testified (Tr. at 32–52) because the April 17, 2009 VE testimony did not address Plaintiff's vocational profile. *See* Tr. at 35–37, Def.'s Br. at 2 n.3. The ALJ issued an unfavorable decision on January 29, 2010. Tr. at 13–24.

On March 1, 2010,[5] Plaintiff requested that the Appeals Council review the ALJ's unfavorable decision. Tr. at 8. Plaintiff's counsel submitted a brief and additional medical records to the Appeals Council for consideration. *See* Tr. at 4, 5.

On August 27, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's unfavorable decision. Tr. at 1–6. The Appeals Council indicated it had considered the reasons Plaintiff disagreed with the ALJ's decision and the additional evidence, which evidence was made part of the administrative record. Tr. at 1 (Appeals Council denial), at 4–5 (Appeals Council ex. list and order making add'l exs. part of record). The Appeals Council further stated it found the additional information did not provide a basis for changing the ALJ's decision. Tr. at 2. Plaintiff brought this action

_____

alleged shoulder impairments were properly considered. Therefore, the undersigned assumes, without deciding, that evidence of Plaintiff's shoulder pain is properly in the record.

[5]Plaintiff requested review on March 1, 2010; SSA received Plaintiff's request for review on March 3, 2010. Tr. at 8.

seeking judicial review of the Commissioner's decision in a Complaint filed on October 21, 2010. [Entry #1].

B.  Plaintiff's Background and Medical History

1.  Background

At his alleged onset date of disability of December 19, 2003, Plaintiff was 38 years old. Plaintiff was last insured December 31, 2008. Tr. at 15. Plaintiff attended school until the twelfth grade and was in "learning disabled resource classes." Tr. at 15, 76, 90. His past relevant work ("PRW") was as a die cutter, electrician helper, truck driver, and maintenance farmer. Tr. at 23.

2.  Medical History

Prior to his alleged onset date, Plaintiff had a history of hernia repairs, kidney stones, high blood pressure (controlled by medication), right wrist fracture (for which he underwent surgery in 1995), gallbladder surgery, right ankle problems, anxiety, and depression. Tr. at 442. Additionally, Plaintiff injured his lower back while working in mid-2002.

On December 19, 2003, Plaintiff presented to Dr. David Shallcross, whose notes indicate that Plaintiff had several injections since he was last seen, with each only providing some temporary relief. On physical examination, Plaintiff's gait was antalgic. Tr. at 808. He had pain with toe walk and could not heel walk. *Id*. There was diminished lumbar range of motion and sacroiliac tenderness. *Id*.

On June 6, 2004, Plaintiff again presented to Dr. Shallcross, who indicated Plaintiff's gait was stable, he was capable of toe walking, heel walking, and tandem walking. Tr. at 796. Dr. Shallcross indicated Plaintiff could return to work with a lifting restriction. *Id*.

On October 6, 2004, Plaintiff returned to see Dr. Lucas, his former back doctor. Tr. at 863. Dr. Lucas found he had a normal gait, but suggested more testing. *Id*. Plaintiff had EMG/NCV testing on December 3, 2004, which was consistent with a mild peripheral neuropathic process. Tr. at 419. On January 21, 2005, Dr. Lucas performed a right-sided L5-S1 laminotomy, partial facetectomy, foraminotomy and diskectomy for his right-sided L5-S1 disc herniation with foraminal stenosis. Tr. at 482. On August 21, 2005, Dr. Lucas noted that Plaintiff was not a candidate for surgical fusion because of his size. Tr. at 848. Dr. Lucas also felt Plaintiff was seeking narcotic medication. *Id.*

On September 6, 2005, Dr. George Bruce evaluated Plaintiff who complained he had no relief from lumbar surgery and that his depression was worsening. Tr. at 630–32. Dr. Bruce gave Plaintiff impairment ratings of 24% to his whole person, and 27% to the lumbosacral spine. *Id*. Dr. Bruce indicated Plaintiff was at maximum medical improvement ("MMI") and did not recommend further surgery. *Id*. He also indicated that aquatic therapy and weight loss would be beneficial. *Id*.

On September 12, 2005, Dr. Lucas indicated that Plaintiff had reached MMI, rating his lumbar spine impairment at 10%. Tr. at 847. He gave permanent restrictions of no lifting greater than 35 pounds. *Id*.

Plaintiff was treated in the ER for back and leg pain on November 21, 2005, December 8, 2005, April 11, 2006, and April 19, 2006. Tr. at 473–79, 871–76, 502–11 and 918–24. On June 14, 2006, Dr. Shallcross recorded Plaintiff's report of pain in his back and a burning sensation in his hips. Tr. at 294. Plaintiff reported going to the ER frequently for pain medicines and being treated as an addict. *Id*. Dr. Shallcross noted that Plaintiff was depressed and drinking a fair amount of beer on the days when he could not get any pain medicine. *Id*. On physical examination, Dr. Shallcross found morbid obesity, stable gait, difficulty standing on his toes, and markedly diminished lumbar flexibility. *Id*. During his July 12, 2006 appointment with Dr. Shallcross, Plaintiff reported symptoms of numbness, tingling and weakness in the lower back and occasional sharp pain in his hips and down his legs. Tr. at 293. Lumbar range of motion remained very diminished. *Id*. Dr. Shallcross's impression was persistent mechanical and radicular back pain L5/S1 laminectomy. *Id*.

On August 9, 2006, Dr. Shallcross noted Plaintiff's persistent pain following laminectomy was stable. Tr. at 292. He indicated Plaintiff was not capable of returning to work and that it was very important for him over the next year to lose 50 to 70 pounds. *Id*. Dr. Shallcross instructed Plaintiff to continue his use of Norco and Effexor. *Id*.

On March 6, 2007, Plaintiff presented to the hospital with left shoulder pain. Tr. at 310–16. He stated that he had fallen a month prior and had experienced increasing left shoulder pain since his fall. Tr. at 312. An examination of his left shoulder showed radial and brachial pulses present; brisk capillary refill; intact sensation; no numbness or tingling; diffuse, intermittent pain; and partial range of motion. Tr. at 313. An x-ray showed minimal degenerative changes in his left acromiaclavicular (AC) joint, but an otherwise unremarkable left shoulder. Tr. at 315. Doctors gave him a splint and prescribed pain medications (Lortab and Ultram) and recommended Advil, rest, and a heating pad. Tr. at 310.

On April 3, 2007, Plaintiff again presented to the hospital with left shoulder and knee pain. Tr. at 317–20, 327, 330. He stated that he had fallen onto a table on his deck. Tr. at 317–18. Doctors noted abrasions and swelling, but no fracture. Tr. at 318. An examination of his left shoulder showed radial and brachial pulses present; brisk capillary refill; intact sensation; no numbness or tingling; and a full range of motion, but diffuse, continuous pain. Tr. at 319. A left shoulder x-ray showed mild osteoarthritis and no evidence of bone trauma. Tr. at 1089. Doctors prescribed more pain medications and recommended that Plaintiff use a splint. Tr. at 320.

In May 2007, state agency physician Dale Van Slooten, M.D., reviewed Plaintiff's medical records and opined that he could: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; sit and stand and/or walk six hours each in an

eight-hour work day; frequently balance, kneel, and crawl; occasionally stoop, crouch, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and had the unlimited ability to push and/or pull. Tr. at 331–38. He also found that Plaintiff had no visual, communicative, postural, manipulative, or environmental limitations, but should avoid concentrated exposure to hazards. *Id*.

On July 7, 2007, Plaintiff presented to the emergency department and complained of left shoulder and low back pain. Tr. at 516–20. He stated that he was picking up one of his grandchildren four days prior and began experiencing pain. Tr. at 516. An examination showed a normal range of motion in his left shoulder, and he was discharged with instructions to ice his back and rest for three days. Tr. at 517.

On August 3, 2007, Robert Schwartz, M.D., reviewed Plaintiff's medical records and examined him. Tr. at 531–32. Dr. Schwartz noted Plaintiff's recent complaints of left shoulder pain and opined that it was "in [Plaintiff's] best interest to seek employment of a light to medium physical demand level." Tr. at 532. The same month, state agency physician Hugh Clark, M.D., reviewed Plaintiff's medical records and agreed with Dr. Van Slooten's earlier opinion regarding Plaintiff's physical abilities and limitations. Tr. at 361–68, *see* Tr. at 331–38.

On September 26, 2007, Dr. Bruce performed an independent medical examination of Plaintiff. Tr. at 625–27. Dr. Bruce, who had evaluated Plaintiff on two prior occasions, Tr. at 630–34, noted that Plaintiff complained of a recent injury to his left shoulder. Tr. at

625–27. An examination of the left shoulder showed subjective tenderness, decreased range of motion, and decreased strength. Tr. at 625–27. Dr. Bruce noted that an MRI was needed to confirm a diagnosis, but opined that Plaintiff had only a 15% impairment of his left shoulder. Tr. at 627. The next month, Plaintiff reported to the hospital and complained of a left shoulder pain and tenderness stemming from a fall. Tr. at 603–09. An examination showed tenderness on palpation, a limited range of motion, and pain. Tr. at 606. An x-ray showed a normal left shoulder. Tr. at 609. Doctors diagnosed mild degenerative joint disease with no fracture and recommended that Plaintiff use a sling and ice his shoulder. Tr. at 608.

On May 16, 2008, Plaintiff was in an automobile accident and went to the ER complaining of pain in his neck and left shoulder and pain/weakness in his low back. Tr. at 713–14. On June 10, 2008, Plaintiff saw Kyle Cassas, M.D., with complaints of left shoulder pain that he reported having since the May 16, 2008 accident. Tr. at 682–83. Dr. Cassas diagnosed Plaintiff with shoulder pain and subacromial impingement and injected Plaintiff's shoulder with cortisone. *Id.* He saw Dr. Cassas again on July 1, 2008, with continued complaints of left shoulder pain he rated as 10/10. Tr. at 746. Dr. Cassas noted Plainitff had received another injection on June 23, 2008, observed that Plaintiff's pain was fairly significant, and referred him to Dr. Michael Kissenberth for a surgical opinion and further care. Tr. at 746–47.

3.    Plaintiff's Shoulder Treatment by Dr. Kissenberth

Dr. Kissenberth first saw Plaintiff in July 2008, at which time Plaintiff recounted his May automobile accident and subsequent treatment, including Dr. Cassas's giving him subacromial injections, which provided some relief to his shoulder pain. Tr. at 743. Plaintiff told Dr. Kissenberth that he had reinjured his shoulder when cranking a boat motor. *Id.* After examination, Dr. Kissenberth scheduled Plaintiff for surgery, and, on July 31, 2008, he performed an arthroscopic chondroplasty, microfracture, labral repair, biceps tenotomy, and decompression on Plaintiff's left shoulder. Tr. at 744, 702–03.

Dr. Kissenberth saw Plaintiff again on September 22, 2008,[6] reporting pain of 8/10 because of shoulder strain caused when he "lifted up a female at the ball game." Tr. at 739. On examination, Plaintiff had pain with shoulder motion, and Dr. Kissenberth indicated he was pleased with the shoulder motion Plaintiff had regained with surgery. *Id.* Dr. Kissenberth administered a steroidal injection intra-articularly, which he hoped would ease Plaintiff's symptoms. Tr. at 740.

On October 27, 2008, Plaintiff saw Dr. Kissenberth and reported pain of 6/10, which was improved from his pre-surgery pain level. Tr. at 737. Dr. Kissenberth noted Plaintiff was doing well postoperatively overall, and he prescribed Ultram ER for pain. Tr. at 737–38.

---

[6]The ALJ mistakenly referred to this visit as being in September 2009. *See* Tr. at 18, 22.

On December 8, 2008, Plaintiff returned to Dr. Kissenberth, reporting continued shoulder pain that he rated as 7/10 and as not being satisfactorily controlled. Tr. at 735. Dr. Kissenberth noted Plaintiff was doing well after surgery, but that he had reinjured his shoulder and had complaints of pain with overhead lifting. Tr. at 735. Dr. Kissenberth's assessment indicated he suspected an underlying rotator cuff injury, for which he ordered an MRI, and he prescribed Lortab for pain. Tr. at 736.

On December 19, 2008, Plaintiff saw Dr. Kissenberth for recheck of his shoulder and rated his pain as 8/10. Tr. at 952. Dr. Kissenberth noted Plaintiff's MRI showed an intact rotator cuff tear and, on examination, found Plaintiff had pain with forced abduction external rotation and when loading his glenoid. *Id.* Dr. Kissenberth found Plaintiff's options were limited unless another surgery was performed, but he determined that surgery was not appropriate at the time. Tr. at 953. He prescribed a series of intra-articular injections for symptom relief, the first of which he administered at the December 19, 2008 visit. Tr. at 953.

On December 29, 2008, Plaintiff returned to Dr. Kissenberth reporting pain as 8/10. Tr. at 950. Dr. Kissenberth found Plaintiff appeared well and was in no acute distress, assessed shoulder pain and subacromial impingement, prescribed Lortab, gave an injection, and scheduled another checkup for the following week. Tr. at 950–51.

After Plaintiff's insured status expired on December 31, 2008, Plaintiff continued to see Dr. Kissenberth for shoulder treatment. On February 16, 2009, Plaintiff saw Dr.

Kissenberth with complaints of intermittent pain of 8/10. Tr. at 948. Dr. Kissenberth determined Plaintiff was not yet at the point of needing shoulder-replacement surgery. *Id.* He observed that Plaintiff had a painful click throughout his shoulder's arc of motion, ordered x-rays, and determined he would operate again, performing a repeat arthroscopy, debridement, and releases as indicated. Tr. at 949.

On February 19, 2009, Dr. Kissenberth manipulated Plaintiff's shoulder operatively, performed lysis of adhesions and labral debridement, which Plaintiff tolerated well. Tr. at 954–55. On March 16, 2009, Plaintiff followed up with Dr. Kissenberth and reported the February 2009 surgery helped him significantly. Tr. at 1011. Dr. Kissenberth found Plaintiff's shoulder had almost a full range of motion with minimal clicking. Tr. at 1012. Dr. Kissenberth informed Plaintiff he may experience persistent left shoulder pain and prescribed Lortab. *Id.* Dr. Kissenberth also told Plaintiff his shoulder may require future arthroplasty work, and instructed him to return on an as-needed basis. *Id.*

The record does not include additional treatment records from Dr. Kissenberth, and the court is unaware of an opinion of Dr. Kissenberth regarding Plaintiff's RFC prior to the November 2009 Medical Source Statement presented to the Appeals Council.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the April 17, 2009 hearing, Plaintiff testified that he lived with his wife and that he last worked in December 2003, when he injured his back on the job. Tr. at 76, 79–80. He testified that he graduated from high school, at which he received vocational training. Tr. at 76–77. He said he could not read and write well. Tr. at 77. He said he had a driver's license and sometimes drove to the grocery store near his home. Tr. at 78–79. He said he was always conscious of pain in his back and legs and sometimes would lay down one to two hours a day to help control his pain, although that did not completely relieve his pain. Tr. at 90–91. He also testified to spending two or three hours per day in a recliner resting his legs. Tr. at 95. He said he spent his days alternating between walking around in the yard and sitting down and resting. Tr. at 103. He said he had not been able to do his hobbies of golf, hunting, and fishing since 2002. *Id.* He said pain made it difficult for him to sleep and that he did "some housework" including laundry, cooking that did not require much standing, and washing small amounts of dishes. Tr. at 104–06. He testified that he tried to do yard work and had cut the grass using a riding lawnmower the previous week. Tr. at 108–09.

He testified that he broke his ankle in 2002 and that he regularly had ankle pain. Tr. at 90–92. He said that a car wreck caused a shoulder injury and that he had undergone

two left shoulder surgeries. Tr. at 95–96. He also had surgery on his right wrist, which left him with no strength in that wrist. Tr. at 96–97. He said he remained limited in his shoulder use and had no strength to pick anything up because he would "run out of strength." Tr. at 97. He stated that he could not use his left arm to reach overhead or for pushing or pulling, and that he had pain in his left shoulder all of the time. *Id.* He testified that he could lift 20 or 30 pounds without bothering his back, and could probably lift ten pounds with his left shoulder. Tr. at 101. He said he had problems reaching overhead, pushing, and pulling, and that he could not bend without pain and could not crawl. Tr. at 102–03. He said he took Ultram for his pain, which he rated as 8/10. Tr. at 107.

b.    VE Testimony[7]

At the October 23, 2009 hearing, VE Benson Hecker testified that Plaintiff's PRW as a dye cutter, electrical helper, electrical contractor, maintenance farm, and truck driver were all of medium exertion and that these jobs had no transferable skills. Tr. at 39.

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age (43 years old as of his date last insured), education, and work history, with the following residual functional capacity ("RFC"): limited to sedentary work with no overhead reaching or frequent bending, and a limitation to simple, routine, repetitive work to maybe even some detailed work, an inability to climb a ladder, rope or scaffold, a limitation to climbing ramps or stairs only occasionally, a limitation to occasional

---

[7]The record also contains the vocational report of Randy Adams, which Plaintiff submitted. *See* Tr. at 442–50 (Rpt. of Adams).

stooping, occasional crouching, frequent balancing, kneeling, and crawling, and avoidance of concentrated hazards. Tr. at 40–44. The VE found such a person could not perform Plaintiff's PRW, but that there were jobs the person could perform, which he identified. Tr. at 40–41.

The ALJ added to the initial hypothetical and asked VE to consider such a hypothetical person who could perform unskilled, sedentary work and could stand and/or walk two hours of an eight-hour work day; sit six hours in an eight-hour work day; occasionally stoop, crouch, and climb ramps and stairs, but never climb ladders, ropes and scaffolds; frequently balance, kneel, and crawl; should never engage in bilateral overhead reaching; should avoid concentrated exposure to hazards; and was limited to simple, routine, and repetitive tasks. Tr. at 40–44. The VE testified that such an individual could not perform Plaintiff's PRW, but could perform unskilled sedentary jobs, such as sorter (472,900 jobs nationwide and 11,480 jobs in the state), assembler (288,480 jobs nationwide and 1,220 in the state), and surveillance monitor (9,030 jobs nationwide according to the *Dictionary of Occupational Titles*, and 75 to 100 in the state, according to the VE). Tr. at 44–45.

The VE was asked an additional hypothetical that considered a limitation to Plaintiff's arm use that Plaintiff alleges the ALJ improperly overlooked in his decision. The ALJ asked the VE to assume someone of Plaintiff's age, education, and PRW, who could not reach overhead bilaterally, and to further assume only the limitations found in the March 13, 2007 functional capacity evaluation ("FCE") prepared by Healthsouth

physical therapist ("PT") Kristin Lovett. Tr. at 45–48; Tr. at 933–42 (FCE). The ALJ asked the VE to review the FCE limitations, which provided for a person who could perform medium work with constant sitting, frequent standing, and occasional walking, with limited[8] use of the right arm for shoulder height and overhead reaching. Tr. at 45; *see* Tr. at 934–36. The ALJ also added the limitations of no climbing of ladders, ropes, or scaffolds, and no overhead reaching bilaterally. Tr. at 46. The VE opined that there was no work such an individual could perform, even if he considered the same limitations at the sedentary level of exertion. *Id.* The VE explained that he interpreted the PT's opinion that Plaintiff had "limited use of right arm for shoulder height and overhead reaching" (Tr. at 934) as meaning he could "only occasionally" reach shoulder height and overhead. Tr. at 45–48. He explained that, at sedentary levels, working from a bench, the individual would "be required to use his bilateral upper extremities at table- or shoulder-height to perform work activity and have his upper extremities function independently." Tr. at 46. The VE added that this meant the individual's right extremity would not be "resting on the table." *Id.* When asked by the ALJ whether his opinion would change if the hypothetical individual could use his upper extremities frequently, the ALJ opined he could do the identified jobs of sorting, assembly, and surveillance monitor. Tr. at 51.

---

[8]The record copy of the FCE chart (page 3 of the FCE form) does not include a heading over the column relating to Plaintiff's reaching abilities. *See* Tr. at 936. However, in the FCE's narrative conclusions on page 1 of the form, PT Lovett describes Plaintiff's limitations as including "limited use of right arm for shoulder height and overhead reaching." Tr. at 934; *see also* Tr. at 46–47.

2. The ALJ's Findings

In his January 29, 2010 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 19, 2003 through his date last insured of December 31, 2008 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe combination of impairments: status post L5-S1 laminectomy, degenerative disc disease, degenerative joint disease, rotator cuff tear, obesity, depression and anxiety (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary exertional work as defined in 20 CFR 404.1567(a) with some other limitations. I specifically find the claimant can lift and carry up to 10 pounds at a time. I also find that he can stand and walk for two hours of an eight hour work day. I find that he can sit for six hours of an eight hour work day. I find that he can occasionally climb ramps and stairs, but can never climb ladders, ropes and scaffolds. I find that he can frequently balance, kneel and crawl; but can occasionally stoop and crouch. I find that he should avoid concentrated exposure to hazards. I further find that he should never engage in bilateral overhead reaching, and that he is also limited to simple, routine and repetitive tasks.

6. In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4P and 96-7p. I have also considered

opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

7.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

8.  The claimant was born on May 12, 1965 and was 43 years old, which is defined as a younger individual age 18–44, on the date last insured (20 CFR 404.1563).

9.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

12. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 19, 2003, the alleged onset date, through December 31, 2008, the date last insured (20 CFR 404.1520(g)).

Tr. at 15–24.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons: 1) the Appeals Council erred by failing to explain the weight it gave additional evidence and the reasons it denied Plaintiff's request for further review; 2) the ALJ did not properly evaluate the evidence in determining there was work Plaintiff could perform despite his shoulder and arm impairments; 3) the ALJ improperly ignored the vocational report of Randy Adams;

4) the ALJ improperly discounted Plaintiff's credibility; and 5) the ALJ improperly relied on the internally-contradictory testimony of VE Hecker. The Commissioner counters that substantial evidence supports the ALJ's findings and that neither the ALJ nor the Appeals Council committed legal error in finding Plaintiff was not disabled during the period at issue.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[9] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[9]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345

(4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Remand Recommended for Consideration of New and Material Evidence

Plaintiff argues that the additional evidence he submitted, particularly the November 6, 2009 report of his orthopedist Dr. Kissenberth, regarding limitations on his shoulder use, was new and material and should be weighed by a factfinder. Pl.'s Br. at 28–29, Pl.'s Resp. in Support of Report at 6–7. In response, the Commissioner argues the November 2009 report need not be considered because it was rendered after Plaintiff's insured status expired and is not new and material. *Id.* at 20–22. In order to be "new" evidence, the evidence must not be "duplicative or cumulative," and in order to be "material," there must be a "reasonable possibility that it would have changed the

outcome." *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (*en banc*).

      a.       The ALJ's Findings Regarding Plaintiff's Shoulder

The ALJ limited Plaintiff to sedentary work with additional restrictions, including a finding that he could never engage in bilateral overhead reaching. Tr. at 20–21. In his decision, the ALJ recounted Plaintiff's medical history, including some of his 2008 and 2009 treatment by Dr. Kissenberth. Tr. at 15–22. He particularly referenced Plaintiff's July 2008 left shoulder surgery and notes from Plaintiff's later visits to Dr. Kissenberth, including Dr. Kissenberth's March 2009 treatment notes. Tr. at 18, 22.

      b.       Dr. Kissenberth's November 2009 Opinion

The additional evidence Plaintiff submitted to the Appeals Council included the November 6, 2009 Medical Source Statement of Ability to Do Work-Related Activities (Physical) of Dr. Kissenberth.[10] Tr. at 1182–85. Dr. Kissenberth found Plaintiff could lift/carry up to 20 pounds occasionally and ten pounds frequently. Tr. at 1182. He opined Plaintiff's ability to push/pull was limited in his upper extremities, which he explained meant Plaintiff could not perform any lifting with his left shoulder. Tr. at 1183. Dr. Kissenberth also opined that Plaintiff could never crawl or climb, but could occasionally

---

[10]Although Plaintiff submitted other records to the Appeals Council, he focuses his argument on Dr. Kissenberth's November 2009 Medical Source Statement only. *See* Tr. at 4–5 (Appeals Council's ex. list and order incorporating additional evidence into record); 279–81 (May 4, 2010 brief to Appeals Council, which was added to record); 1156–1203 (the additional evidence).

balance, kneel, crouch, and stoop. *Id.* He found Plaintiff could not reach in any direction, including overhead, could handle (gross manipulation) occasionally, and he placed no limits on Plaintiff's ability to finger and feel. Tr. at 1184.

c.     New and Material Evidence

Although the Commissioner spends little time on this argument, he suggests that the additional evidence need not be considered because it was rendered nearly a year after Plaintiff's insured status expired, meaning it is not new and material and does not relate to the period at issue. Def.'s Br. at 20. Based on its review of the record, including the additional opinion of Dr. Kissenberth, and the ALJ's decision, the court cannot recommend dismissal of this issue on the ground that the 2009 opinion does not relate to the period at issue. Here, in finding Plaintiff was not disabled, the ALJ discussed some of Plaintiff's 2009 visits to Dr. Kissenberth, as well as his activities just prior to the April 2009 hearing. *See* Tr. at 18, 22. On these facts, the court cannot recommend a finding that the November 2009 opinion could not be material or new.

In *Wilkins v. Sec'y, Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991) (*en banc*), claimant submitted to the Appeals Council an additional opinion from her physician that post-dated the period being considered by the ALJ in his decision. 953 F.2d at 94–96. The court found that evidence related to the period at issue. *Id.* at 96. Making the determination the additional evidence was not "new" under these facts could be tantamount to improper conjecture regarding why the Appeals Council did what it did.

24

*Cf. Allen v. Bowen*, 816 F.2d 600, 601 (11th Cir. 1987) (finding Appeals Council "could surmise" rebuttal evidence was not "new" for purposes of whether it needed to consider when claimant requested review of ALJ's decision).

Having reviewed the record evidence, the undersigned is of the opinion that Dr. Kissenberth's November 2009 Medical Source Statement is new, material, and relates to the period at issue under 20 C.F.R. § 404.970(b). The evidence provides additional information regarding Plaintiff's DIB claim, particularly regarding the ALJ's findings regarding Plaintiff's nonexertional limitations on his upper extremities. The court notes that the VE's somewhat confusing testimony in response to the ALJ's various hypothetical questions does, as Plaintiff argues, seem to turn on the extent Plaintiff's shoulder was limited. Compare Tr. at 46–48 (VE opining there would be no jobs if Plaintiff could not lift his shoulder more than occasionally) with Tr. at 51–52 (VE finding there were jobs Plaintiff could perform if Plaintiff could frequently use his upper extremities with no overhead reaching bilaterally). For the foregoing reasons, the undersigned recommends remand for consideration of Dr. Kissenberth's November 2009 Medical Source Statement and other new evidence submitted to the Appeals Council.

      d.      The ALJ's Prior Evaluation of Plaintiff's Arm and Shoulder Impairments In Light of New and Material Evidence

Plaintiff argues that regardless of the new and material evidence, there is uncontradicted evidence, not properly discounted by the ALJ, that Plaintiff's left arm has

a significant nonexertional impairment, in addition to the ALJ's limitation of overhead reaching. The undersigned disagrees.

The ALJ discussed Plaintiff's left shoulder pain and limitations. Tr. at 17–18, 21–22. He then explicitly "limited [Plaintiff] exertionally, posturally and manipulatively" to accommodate Plaintiff's left shoulder pain and right wrist weakness, by finding him capable of sedentary work with no bilateral overhead reaching. Tr. at 20–21. In reaching his conclusions, the ALJ addressed Plaintiff's left shoulder limitations at length, including Dr. Kissenberth's treatment notes, and concluded that Plaintiff could lift and/or carry only up to 10 pounds and should never engage in bilateral overhead reaching. Tr. at 17, 18, 20–21, 22. For example, the ALJ noted that Dr. Kissenberth's treatment notes indicate that he performed shoulder surgery on Plaintiff in July 2008, and that only one month after the surgery Plaintiff reported that he was doing "quite well" and that his range of motion was improving. Tr. at 22, *see also* Tr. at 702–03, 741–42, 956–57. Plaintiff does not point to any specific treatment notes that the ALJ failed to take into account, or any specific additional left shoulder limitations that the ALJ failed to include in his assessment.

The undersigned finds that the ALJ's consideration of the arm and shoulder impairments, based on the record before him, was proper and his findings were supported by substantial evidence. However, in light of the undersigned's recommendation that this matter be remanded to the ALJ for consideration of the new and material evidence in the

record, the ALJ should consider the entire record related to Plaintiff's alleged shoulder impairments on remand.

2.    Remaining Allegations of Error Should be Dismissed

While the undersigned recommends remand for consideration of the new and material evidence submitted to the Appeals Council, the remaining allegations of error Plaintiff argues in his brief are without merit and are recommended for dismissal.

a.    Vocational Report of Randy Adams

Plaintiff argues that the ALJ's failure to expressly address Plaintiff's Purdue Pegboard testing results in the vocational report of Randy Adams. Adams administered the test and found that Plaintiff scored in the second percentile for finger dexterity when compared with male hourly production workers. Tr. at 446. Plaintiff scored in the third percentile when both hands were tested and the ninth percentile with both hands in an assembly capacity. *Id.*

The ALJ is not required to expressly assess every piece of evidence considered. *See generally Jackson v. Astrue*, 8:08-2855-JFA, 2010 WL 500449 (D.S.C. Feb. 5, 2010) ("[A]n ALJ is not required to provide a written evaluation of every piece of evidence, but need only minimally articulate his reasoning so as to make a bridge between the evidence and its conclusions.") (internal quotation and citations omitted). Additionally, Plaintiff's right wrist limitations were fully accommodated by the ALJ's finding that Plaintiff was capable of a limited range of sedentary work, which does not require lifting more than 10

pounds or significant pushing or pulling. 20 C.F.R. § 404.1567(a).  Therefore, Plaintiff has not demonstrated that the ALJ improperly failed to consider the vocational report of Mr. Adams.

### b.    Plaintiff's Credibility

Plaintiff argues the ALJ improperly discounted Plaintiff's credibility.  As an initial matter, Plaintiff concedes that the ALJ "expressly consider[ed] the threshold question of whether [the claimant] had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain []he alleges" and "proceed[ed] to considering the credibility of [his] subjective allegations of pain." *Craig v. Chater*, 76 F.3d 585, 596 (4th Cir. 1996). The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting affect of [Plaintiff's] symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment." Tr. at 21.

Instead, Plaintiff argues that the ALJ did not address the medical evidence "before discounting credibility on the narrow point of whether Plaintiff's arms work fine." Pl.'s Br. at 33.  However, a review of the ALJ's opinion reveals that he considered the medical evidence and limited the RFC for Plaintiff exertionally, posturally, and manipulatively as a result. Tr. at 22.  Specifically, the ALJ assigned Plaintiff with an RFC providing that he should "never engage in bilateral overhead reaching, and that he is also limited to simple, routine, and repetitive tasks." Tr. at 21.  Therefore, Plaintiff's argument that the ALJ

disregarded the medical evidence in assessing Plaintiff's credibility is not substantiated by the record.

### c. Alleged Contradictory Testimony of VE Hecker

Plaintiff argues that VE Hecker's testimony related to his identification of a surveillance monitor as a job available to Plaintiff. According to the DOT, this job is sedentary, unskilled, and has a SVP of 2. Plaintiff points out that it has a level 3 reasoning rating which requires a person to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "deal with problems involving several concrete variables in or from standardized situations." DOT Revised (4th ed.), 1991 WL 688702. Plaintiff argues that the ALJ's finding that he was limited to simple, routine, repetitive tasks correlates only with a level 1 reasoning rating. However, in support, Plaintiff cites only to the general DOT description of components, which does not link a specific reasoning level with the performance of "simple routine, repetitive tasks." Therefore, Plaintiff has not shown that VE Hecker's testimony was contradictory in this regard or improperly relied on by the ALJ.[11]

---

[11] Although the undersigned disagrees with Plaintiff's assertion of error, VE Hecker's testimony was somewhat confusing in other regards, *see* discussion *supra* at 25, and the ALJ might find it prudent to clarify the testimony on the record.

III.    Conclusion

Based on the above, the undersigned recommends that the Commissioner's decision be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action as set out herein.

IT IS SO RECOMMENDED.

February 8, 2012                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).